J-A03022-13

2017 PA Super 127

| | |
|---|---|
| RANDALL A. CASTELLANI AND JOSEPH J. CORCORAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| THE SCRANTON TIMES, L.P. AND JENNIFER HENN | |
| Appellants | No. 1145 MDA 2012 |

Appeal from the Order Entered March 23, 2012
In the Court of Common Pleas of Lackawanna County
Civil Division at No(s): 2005-CV-69

BEFORE:  BOWES, GANTMAN, AND OLSON JJ.

OPINION BY BOWES, J.:                          **FILED APRIL 26, 2017**

This case is on remand from our Supreme Court.[1]  In the prior panel decision, we set forth the procedural and factual history of this matter.[2]  In order to avoid duplication of judicial resources while maintaining a cogent narrative, we repeat the salient facts.

The present appeal by permission is from two interlocutory pretrial orders entered in this consolidated defamation action.  On January 7, 2005,

---

[1]  The case was remanded on March 3, 2016.  **Castellani v. Scranton Times, L.P.**, 133 A.3d 5 (Pa. 2016).

[2]  **See Castellani v. Scranton Times**, 105 A.3d 29 (Pa.Super. 2014) (unpublished memorandum).

Randall A. Castellani and Joseph J. Corcoran (collectively the "Commissioners") filed this defamation lawsuit against Appellants, The Scranton Times, L.P. and one of its reporters, Jennifer Henn (collectively the "Scranton Times"). The action was based upon the January 12, 2004 publication by the Scranton Times of an article in both the Scranton Times and the Times-Tribune newspapers. The subject of the story involved an investigation by the Office of the Attorney General of Pennsylvania ("Attorney General") into corruption that purportedly had occurred at the Lackawanna County Prison. In 2003, the Attorney General convened a statewide investigating grand jury in connection with its probe. At that time, Mr. Castellani and Mr. Corcoran were Lackawanna County Commissioners as well as members of the Lackawanna County Prison Board, and, by virtue of those offices, had oversight of the Lackawanna County Prison. They were called to testify before the grand jury, and the article reported on their testimony before that body.

The January 12, 2004 newspaper story consisted of eighteen paragraphs, and paragraphs two, three, and four of the article were the basis for the Commissioners' present defamation suit, commenced at docket number 2005-CV-69. The paragraphs, in numerical order as they appeared, outlined that: 1) the Commissioners testified before the statewide grand jury; 2) a source that was close to the investigation informed the Scranton Times that the Commissioners were considerably less than cooperative with

the jurors and often responded to questions with vague and evasive statements; for example, the Commissioners could not recall or were unaware of the answer; 3) the jurors became irritated with the Commissioners since they were accustomed to hearing detailed information during the proceedings; 4) the jurors wanted to send the Commissioners from the courtroom; 5) when first questioned about his grand jury appearance, Mr. Castellani, while in the presence of his attorney, denied that he testified before the grand jury; 6) Mr. Castellani told the newspaper that the reporter had "the wrong guy;" 7) after the newspaper confirmed that Mr. Castellani had appeared before the grand jury, Mr. Castellani was questioned again and, in the presence of the lawyer, refused to comment on anything about the grand jury investigation, including his previous statement that he had not appeared before that body; 8) even though grand jury proceedings are closed to the public and prosecutors cannot discuss grand jury proceedings, witnesses are free to speak about their testimony; 9) Mr. Castellani was reminded that he was permitted to discuss his testimony, but he still refused to talk; 10) Mr. Corcoran could not be reached for comment; 11) the Attorney General was investigating the county prison due to the fact that it received information about alleged corruption there in a drug trafficking case, but the grand jury investigation had expanded into a probe of allegations as to improper use of inmate labor, sex for drugs schemes, financial mismanagement, and improper political activity; 12) as the

majority commissioners for Lackawanna County, the Commissioners were largely responsible for running the prison, and the county's prison board acted only in an advisory capacity; 13) the prison board included the three county commissioners, the district attorney, the sheriff, the county controller, and president judge; 14) the grand jury recently subpoenaed additional witnesses and more prison financial records, and county officials were told to send a list of all vehicles owned or operated by the prison since 1995, as well as repair and maintenance records for those vehicles, including invoices for purchased parts; 15) the Times-Tribune was conducting its own investigation into prison operations and found that the prison administration was running an automobile body shop at the jail and that the administration had used inmate labor to work on vehicles, including those owned privately by prison guards and prison staff; 16) an interim warden was interviewed and stated that he had timely complied with the latest grand jury subpoena; 17) a previous grand jury subpoena secured information about the prison's canteen fund and the inmates' individual accounts from 1998; and 18) the Times-Tribune's investigation revealed that inmates, including felons convicted of charges such as embezzlement and fraud, were helping to administer the canteen and prison inmate accounts.

The January 12, 2004 article immediately generated litigation before the statewide investigating grand jury. Judge Isaac S. Garb was the supervising judge of that body at the time. The Commissioners asked Judge

Garb to sanction the newspaper because it violated the secrecy laws governing grand jury proceedings. That request was denied based upon the reasoning that the Commissioners lacked standing. The Commissioners then demanded that the Attorney General be sanctioned for revealing details of the Commissioners' appearance before the grand jury.

After this second request was directed to him, Judge Garb appointed a special prosecutor, Terence P. Houck, Esquire, to determine whether the Attorney General improperly revealed information to the Scranton Times. The special prosecutor prepared a confidential report for Judge Garb. Judge Garb, in turn, authored a September 14, 2004 memorandum regarding the matter before him. In that document, Judge Garb stated that Mr. Houck "determined that there was no breach of secrecy by any Agent of the Attorney General's Office." Memorandum, Isaac S. Garb, 9/14/04, at 2. In his September 14, 2004 decision, Judge Garb concurred with Mr. Houck's assessment. *Id*. He also expressed his personal opinion regarding the veracity of the January 12, 2004 article. After he had reviewed Mr. Houck's report, the documents accompanying the report, and the transcript of the testimony of the Commissioners, Judge Garb opined:

> The reports published in these newspapers are completely at variance with the transcript of the testimony of these witnesses. The newspaper reports provide that the witnesses were evasive in their answers, were non-cooperative, essentially "stonewalled" the Grand Jury in its inquiry and that the Grand Jurors became irate as a result of that demeanor on the witnesses [sic] part, and demanded that they be "thrown out" of

the Grand Jury courtroom. None of those things happened. Obviously, if someone wished to leak the testimony of a witness to the Grand Jury that information relayed to the media would have reflected the testimony that actually occurred. The report of the testimony of the witnesses was totally at variance and not borne out by the record of the witnesses' testimony. Obviously, the source of the reporter's information was someone not privy to the Grand Jury proceedings and, therefore, not someone in the Office of the Attorney General.

*Id*. at 2. Judge Garb also opined:

The reports in these newspapers which purport to be a reflection of the testimony of Randall Castellani and Joseph Corcoran are totally at variance with the transcript of their testimony before the Grand Jury. The characterization of their testimony in the newspaper reports is belied by the record. Each witness testified unhesitatingly and with clarity. The witnesses were cooperative. Their testimony was not vague. At no time did the Grand Jurors become irate or indicate a readiness to throw the witnesses out of the Grand Jury room.

*Id*. at 3.

Since the Scranton Times did not have a copy of the transcripts of either of the Commissioners' testimony, it could not determine if it concurred with Judge Garb's characterization of the transcripts. It published an article four days later, on September 18, 2004, that reported on both the results of Mr. Houck's probe and Judge Garb's memorandum. The September 18, 2004 story also contained three paragraphs about the contents of the January 12, 2004 article. In its first mention of the January 12, 2004 article, the September 18, 2004 publication stated that the subject matter of the Houck probe involved "a story in the Jan. 12 editions of The Scranton Times and The Tribune about Commissioner Randy A. Castellani and former

Commissioner Joseph J. Corcoran's testimony before the grand jury." Paragraph four read, "Citing a source close to the investigation, the newspapers reported the commissioners often responded with vague, evasive answers that irritated the jurors, who were ready to 'yank each of them out of the witness chair.'" In paragraph eight, the article said, "'The newspaper's source has been contacted and says he absolutely stands by his account of the grand jury testimony,' said Lawrence K. Beaupre, managing editor of the Times-Tribune newspapers."

The remainder of the September 18, 2004 article discussed 1) the Houck inquiry into the source of the grand jury leak; 2) the results of that probe; 3) summaries of Judge Garb's comments about the Commissioners' grand jury testimony; 4) actual quotations from Judge Garb's September 14, 2004 memorandum; 5) the nature of the allegations being explored by the grand jury; and 6) the reaction of Lawrence J. Moran, the Commissioners' attorney, to Judge Garb's memorandum. The September 18, 2004 article contained hearsay comments from Mr. Moran that implicitly revealed Judge Garb's opinion as to the falsity of the January 12, 2004 report:

> Mr. Moran said Judge Garb's memorandum validated his clients' contention that either the source lied about the commissioners' testimony or the newspapers fabricated the story.
>
> "Either way, on the basis of Judge Garb's memorandum and order, it seems that at a minimum the newspaper owes something to Mr. Corcoran and Mr. Castellani," Mr. Moran said.

"That is, and on their behalf I demand, that the papers publish a front-page story retracting and apologizing to Mr. Corcoran and Mr. Castellani for the stories which have now been indisputably established to have been false."

He also called on the newspapers to identify their source, saying any promise of confidentiality would seem to be "no longer binding" based on Judge Garb's order.

The Scranton Times, 1/12/04.

On September 16, 2005, the Commissioners instituted a second action against the Scranton Times by writ of summons. In a complaint filed on March 15, 2010, the Commissioners claimed defamation premised upon the September 18, 2004 article. The Commissioners then petitioned to consolidate the defamation case involving the September 18, 2004 article with the already existing defamation lawsuit concerning the January 12, 2004 article. The Scranton Times opposed that request, arguing that consolidation would be prejudicial and was merely a calculated effort by the Commissioners to prove that the January 12, 2004 article was false by using Judge Garb's opinion as to its falsity, as outlined in the September 18, 2004 article. Consolidation was granted, and the defamation action regarding the September 18, 2004 article was joined at this action number.

The Commissioners then presented a motion to the trial court asking that the Scranton Times be required to disclose the anonymous source for its January 12, 2004 article. That motion was granted, and the newspaper appealed. We reversed based upon application of the Pennsylvania Shield

Law, 42 Pa.C.S. § 5942.[3] *Castellani v. Scranton Times, L.P.*, 916 A.2d 648 (Pa.Super. 2007). Our Supreme Court affirmed our decision and rejected the Commissioners' request that the Court graft a "non-textual 'crime-fraud' exception to the Shield Law that would permit compelled disclosure of a newspaper's source if the communication between the newspaper reporter and the source itself constituted a criminal act." *Castellani v. Scranton Times, L.P.*, 956 A.2d 937, 939 (Pa. 2008).

While the parties were litigating whether the Scranton Times had to reveal its source, the parties sought access to materials from the investigating grand jury proceeding. Judge Garb had retired, and Judge Barry F. Feudale was appointed as the supervising judge. The parties' discovery requests were thus directed to Judge Feudale.

The Commissioners asked Judge Feudale to: 1) furnish the parties with the transcript of Mr. Corcoran's testimony; (2) permit the Commissioners to

---

[3] That provision states:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S. § 5942(a).

furnish to the Scranton Times a copy of the transcript of Mr. Castellani's grand jury testimony that had previously been erroneously released by the prosecution at a preliminary hearing held for one of the defendants charged in connection with the corruption at the jail; and (3) disseminate Mr. Houck's report to the Commissioners but not to the Scranton Times.

The Scranton Times also presented discovery requests to Judge Feudale and asked him for (1) copies of the transcripts of the Commissioners' grand jury testimony; (2) copies of Mr. Houck's report with accompanying investigative material; (3) permission to interview Mr. Houck, the jurors, and other people present in the grand jury room when the Commissioners testified; (4) copies of transcripts of any discourse among the Attorney General and the grand jurors about the Commissioners' testimony; and (5) copies of any transcripts wherein Judge Garb or Mr. Houck questioned the Attorney General's agents.

On June 29, 2005, Judge Feudale issued a decision resolving all the discovery requests pending before him. After analyzing the demands and applicable law governing the secrecy of grand jury proceedings, he denied all discovery requests with the exception that he held that the Commissioners could furnish the Scranton Times with a copy of a previously-released transcript of Mr. Castellani's grand jury testimony. After resolving the issues that he had been asked to address, Judge Feudale, as had Judge Garb,

gratuitously opined as to the falsity of the January 12, 2004 article. Judge Feudale echoed Judge Garb's assessment of the veracity of that article.

In a sixteen-paragraph article that appeared on July 7, 2005, the Scranton Times reported on Judge Feudale's resolution of the discovery requests. The article also outlined that Judge Feudale criticized the January 12, 2004 story, and he stated that it had "no foundation in the record of testimony under dispute before the grand jury." The article reported that Judge Feudale had castigated the newspaper's request to obtain interviews of people present during the Commissioners' testimony before the grand jury by calling that request "absurd" and "beyond the pale." To apprise the reader of the facts necessary for an understanding of the July 7, 2005 article, said article stated in paragraph four:

> Mr. Castellani and Mr. Corcoran claim they were defamed in a Jan. 12, 2004 article published by The Times-Tribune describing their testimony before the grand jury as vague and evasive. The article cited an anonymous source close to the investigation. The former commissioners claim the story is false. The newspaper stands by its report.

In another paragraph, the July 7, 2005 story outlined that the editor of the newspaper believed that its reporting eventually would be vindicated.

The July 7, 2005 article also noted that the trial judge supervising this consolidated defamation case had ordered the newspaper to reveal its secret source named in the January 12, 2004 story, and that Judge Feudale had praised that ruling. The July 7, 2005 article continued that Judge Feudale

additionally said that "he would have gone further – he would have summoned former reporter Jennifer L. Henn and her editors and ordered them to reveal their source" or face contempt. Finally, the July 7, 2005 article outlined that the Commissioners' attorney was elated by Judge Feudale's remarks since they gave the Commissioners "tremendous momentum" in that Judge Feudale concluded that the Commissioners "had testified truthfully, candidly and completely."

After the Supreme Court affirmed this Court's order vacating resolution of the trial court order mandating that the Scranton Times reveal its source for the January 12, 2004 article, matters resumed before the trial court. Countervailing motions for summary judgment were denied. The parties then asked the trial court to resolve certain evidentiary matters. The Commissioners sought permission to admit into evidence the full decision authored by Judge Garb on September 14, 2004, as well as the one penned by Judge Feudale on June 29, 2005. The Scranton Times opposed that requested relief. On June 8, 2011, the trial court concluded that those memoranda were inadmissible hearsay opining on a key issue at trial, *i.e.*, the falsity of the January 12, 2004 newspaper article. Thus, it denied the Commissioners' request that the two judicial opinions be admitted into evidence at trial in this matter.

The Commissioners were granted permission to file an interlocutory appeal from the June 8, 2011 ruling. On appeal, we affirmed, holding that

"the Garb Opinion and the Feudale Opinion are incompetent evidence" and that "both Opinions are inadmissible in their entirety as separate documents at trial." *Castellani v. The Scranton Times, L.P.*, 100 A.3d 304 (Pa.Super. 2014) (*Castellani I*) (unpublished memorandum at 52).

On June 8, 2011, the trial court also resolved a pending issue of whether the September 18, 2004 article was admissible in connection with the jury's resolution of the merits of the defamation lawsuit as to the January 12, 2004 article. The trial court determined that the September 18, 2004 article constituted a republication of the first article, and was admissible pursuant to *Weaver v. Lancaster Papers, Inc.*, 926 A.2d 899 (Pa. 2007). In *Weaver*, our Supreme Court held that the fact that a party republished the contents of the statement after being instructed that it was false constituted evidence that the party published the first false, defamatory statement with actual malice.[4]

---

[4] In *Weaver*, the plaintiff was a police officer, Robin Weaver, who had investigated a murder. A woman was tried and convicted for the crime, and obtained relief in federal court. The federal court accused Weaver and his fellow investigating officers of fabricating and destroying evidence and of perjury. During the federal *habeas* proceeding, the convicted defendant also claimed that Weaver raped her. No rape charges were filed against Weaver. Based on these events, a letter to the editor from Oscar Brownstein was published by two newspapers. That letter insinuated that the convicted defendant had not fabricated her rape charges and stated that Weaver had been "arraigned for the sexual abuse of women and children." *Weaver v. Lancaster Papers, Inc.,* 926 A.2d 899, 901 (Pa. 2007).

*(Footnote Continued Next Page)*

Applying **Weaver**, the trial court in this matter concluded that, even though Judge Garb's memorandum itself was inadmissible at trial, the full September 18, 2004 story, including those portions of that document outlining and quoting the jurist's infirm hearsay, was admissible as evidence of actual malice since the September 18, 2004 article constituted a republication of the January 12, 2004 article.

The Scranton Times filed a motion for reconsideration of the June 8, 2011 interlocutory order on July 15, 2011. In that motion, the Scranton Times sought the exclusion of the September 18, 2004 article on the ground that its relevance was significantly outweighed by the danger of unfair prejudice. Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

*(Footnote Continued)* —————————

Weaver instituted a defamation lawsuit against Brownstein and the newspapers that published Brownstein's letter. Weaver averred that he did not rape the defendant, had not been charged with that crime, and was never arraigned for sexually abusing women and children. Three months after the defamation case was filed, Brownstein republished his entire letter on a website.

The newspapers and Brownstein filed motions for summary judgment in Weaver's defamation action. Those motions were granted based on the conclusion that Weaver could not prove that the three defendants acted with actual malice. We affirmed, and our Supreme Court reversed, but only as to Brownstein. It held that Brownstein's republication of his entire letter after being told that it was false was relevant to his actual malice in connection with publishing it in the first instance.

wasting time, or needlessly presenting cumulative evidence."). Alternatively, the Scranton Times asked that the issue of falsity of the January 12, 2004 article be bifurcated from the other liability questions at trial so that the September 18, 2004 article, which was relevant only as to actual malice, would not be used by the jury in resolving the issue of the January 12, 2004 story's falsity.

At the August 8, 2011 argument on the July 15, 2011 motion for reconsideration, the Scranton Times requested three forms of relief from the June 8, 2011 ruling. First, it petitioned the court to reconsider its decision that the September 18, 2004 article constituted a republication under **Weaver**. It also asked that the portions of the September 18, 2004 article relating to Judge Garb's hearsay comments on the January article's falsity be redacted. Finally, it asked for bifurcation of either the two actions or of the issue of falsity of the January 12, 2004 article from the remaining issues at trial.

On August 19, 2011, the trial court concluded that the July 15, 2011 motion was premature. However, on March 23, 2012, shortly before the anticipated trial, the trial court issued a definitive ruling on the Scranton Times' requests. It re-affirmed its decision to consolidate the two actions and rejected the Scranton Times' request to bifurcate the trial on the January 12, 2004 article from the trial on the September 18, 2004 article. It acknowledged:

There is little question that a certain quantum of prejudice will result from the introduction of the second article of September 18, 2004. The publication of Judge Garb's findings concerning the testimony of both Plaintiffs strikes at the heart of one of the threshold issues for resolution. If the article is permitted to be introduced unredacted, the jury will hear and see, among other information, that Judge Garb concluded that the newspaper reports "are completely at variance with the transcript of the testimony . . ."

The degree of prejudice [to the newspaper] and whether it can be cured through a curative instruction is one capable of varying opinions.

Trial Court Opinion, 3/23/12, at 3-4. The trial court likewise refused to bifurcate the issue of the falsity of the January 12, 2004 article and have that issue decided first. The trial court opined that bifurcation was a "daunting task" since the questions of falsity and malice were interwoven. *Id*. at 5. It also premised its ruling upon the belief that submitting the question of the falsity of the January 12, 2004 article to the jury first before proceeding to ask it to decide the falsity of the September 18, 2004 article and whether the Scranton Times acted with actual malice "would essentially be stripping the plaintiffs of their second cause of action." *Id*.

On March 30, 2012, the Commissioners petitioned the trial court to rule that the July 7, 2005 article also was a republication of the January 12, 2004 article and admissible in full at trial under *Weaver*. The Scranton Times opposed this demand, but on April 11, 2012, the trial court held that the July 7, 2005 article was a republication. It also refused the Scranton Times' request for redaction of Judge Feudale's remarks in the July 7, 2005

- 16 -

article, from the jury's consideration and for bifurcation of the falsity/malice issues. The Scranton Times obtained permission for interlocutory review of both the March 23, 2012, and April 11, 2012 orders. In that appeal from the two orders, the following issues were raised:

> 1. Whether the Trial Court erred in finding that the September 18, 2004 Article and the July 7, 2005 Article, respectively reporting on the Garb Memorandum and Feudale Opinion, constituted admissible evidence as to whether the Scranton Times published the January 12, 2004 Article with actual malice, under the Pennsylvania Supreme Court's decision in *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899 (Pa. 2007).

> 2. Whether the Trial Court erred in refusing to exclude the September 18, 2004 Article and the July 7, 2005 Article on the basis that the danger of unfair prejudice caused by the admission of this evidence on the threshold issue of falsity outweighed the marginal probative value of this evidence on the issue of actual malice under Pa. R. Evid. 403.

> 3. Whether the Trial Court erred in refusing to bifurcate the issue of falsity of the January 12, 2004 Article from the remainder of issues in this jury to minimize the danger of unfair prejudice to the Scranton Times caused by the exposure of the jury to the September 18, 2004 Article and the July 7, 2005 Article, prior to the jury deciding if the January 12, 2004 Article was false.

*Castellani v. Scranton Times*, 105 A.3d 29 (Pa.Super. 2014) (unpublished memorandum at 20) (*Castellani II*).

In *Castellani II*, we affirmed the trial court's ruling that the September 18, 2004 and July 7, 2005 articles constituted republications under the Supreme Court's decision in *Weaver*, *supra*. We therefore held that the latter two articles could be introduced to establish malice. This Court in *Castellani II* then addressed the second contention raised by the

Scranton Times. As noted, that newspaper asserted that the September and July articles, even if republications, were inadmissible in that their probative value as to actual malice was outweighed by their prejudicial impact on the question of falsity. We concurred with this assessment. The latter two articles, as republications, were pertinent only as to actual malice. Meanwhile, as observed by the Scranton Times, other sections of the September 18, 2004 and July 7, 2005 articles contain highly prejudicial hearsay from judges regarding the falsity of the January 12, 2004 article, summarized the judicial opinions, and outlined inadmissible and inflammatory hearsay remarks from Mr. Moran that inferentially revealed the opinion of the two judges in question by trumpeting his clients' vindication by the jurists' comments.

In ruling that Judge Garb's and Judge Feudale's remarks as to the falsity of the first article had to be redacted, we relied in ***Castellani II*** upon the outcome in ***Castellani I***. As a reminder, the ***Castellani I*** decision affirmed the trial court's ruling that Judge Garb's September 14, 2004 decision and Judge Feudale's June 29, 2005 opinion constituted inadmissible hearsay as to the falsity of the January 12, 2004 article, and that the jurists' opinions as to that article's falsity was not relevant as to malice since the judicial opinions were issued after publication of the January 12, 2004 article.

This Court additionally opined in ***Castellani I*** that, even if the decisions authored by Judges Garb and Feudale constituted admissible proof as to malice, they were highly prejudicial to the Scranton Times on the question of falsity. The ***Castellani I*** Court ruled that any probative value of the two memoranda as to malice was significantly outweighed by the prejudice to the newspaper. In this connection, we noted that the jurists' beliefs as to the January 12, 2004 article's truth were of minimal probative value in light of the fact that the opinions were premised solely upon a review of transcripts, and that Judge Garb and Judge Feudale, not being present during the Commissioners' grand jury testimony, were incapable of gauging the jurors' reactions or whether the Commissioners' testimony was evasive due to the manner in which it was delivered. This Court continued that these opinions as to falsity emanated from judges, and thus, would be given great weight by the jury. The ***Castallani I*** Court ruled that the two memoranda were "inadmissible hearsay and any limiting instruction would be fruitless." ***Castellani I*** (unpublished memorandum at 48).

Given the ruling in ***Castellani I***, the ***Castellani II*** panel held that the portions of the judges' opinions that were reprinted or quoted or revealed in the September 18, 2004 and July 7, 2005 articles were inadmissible and had to be redacted and that the trial court abused its discretion when it ruled that the entire September 18, 2004 and July 7, 2005 articles could be submitted to the jury. This Court found that the infirm portions of the

September 18, 2004 and July 7, 2005 articles had to be redacted before those articles were admitted into evidence. In light of the trial court's belief that redaction was not possible, we redacted the articles ourselves. Based upon our redaction decision, the **Castellani II** Court concluded that it was unnecessary to bifurcate the issues of falsity from malice. Judge Gantman dissented, concluding that the better course was to bifurcate the issues by having the jury first determine whether the January 12, 2004 article was false before it proceeded to examine the issues of the falsity of the September 18, 2004 article and malice.

After this Court issued the decision in **Castellani II**, our Supreme Court reversed **Castellani I**. **Castellani v. Scranton Times, L.P.,** 124 A.3d 1229 (Pa. 2015) ("**Castellani III**"). It held that the September 14, 2004 opinion of Judge Garb and the June 29, 2005 opinion by Judge Feudale could be introduced at trial as to malice alone. In so doing, our Supreme Court expressly limited the purpose for which they could be submitted to the jury, stating that the "the judicial opinions are admissible as evidence of the Newspaper's state of mind." **Id**. at 1231. The sole issue before the Supreme Court was whether the decisions by Judges Garb and Feudale were relevant and admissible "as evidence of the Newspaper's malicious state of mind[.]". **Id**. at 1236. Indeed, the Commissioners maintained to the trial court and our Supreme Court that the opinions would not be introduced to establish the issue of falsity. In light of the fact that the Commissioners

never claimed that the judicial opinions could be used to establish that the January 12, 2004 article was false, the Supreme Court did not expressly rule on that question.

Nevertheless, the **_Castellani III_** Court expressly stated that the comments from Judges Garb and Feudale could not be used as proof of the falsity of the January 12, 2004 article. It stated that, although the judicial statements regarding the first article's falsity "will undoubtedly be prejudicial to the Newspaper," the "potential for the jury **to consider the judicial opinions for an improper basis, such as evidence of the defamatory statements' falsity**, can be ameliorated by a limiting instruction to the jury that it alone must decide whether the Newspaper's articles were published with malice, and the judicial opinions were offered for the limited purpose of supporting Appellants' claim in this regard." **_Id._** (emphasis added). In a footnote associated with this aspect of its holding, the majority in **_Castellani III_** did not opine as to whether bifurcation would provide a better solution than a limiting instruction and accorded that task to the trial court.

Thus, our High Court stated that it would be improper for the jury to consider the judicial opinions as proof that the contents of the January 12, 2004 article were false and that the jury could be given an instruction as to the limited purpose for which it could use the statements by Judges Garb and Feudale. Despite the fact that the comments would be limited to establishing a state of mind, but not related to the article's falsity, the

*Castellani III* Court held that the probative value of the two judicial opinions as to the Scranton Time's state of mind outweighed any prejudicial impact regarding their effect on the jury's decision as to the issue of falsity.

Justice Eakin concurred that the decisions authored by Judge Garb and Judge Feudale could be introduced to establish malice, but believed that a limiting instruction would not be sufficient "to ensure the jury will not consider these opinions as proof the publications were in fact false." *Id*. at 1246. That jurist concluded that "it would be asking the impossible of jurors" to demand that they ignore the strong opinions of Judges Garb and Feudale that the first article was false and consider those statements only in connection with the question as to whether the Scranton Times acted with malice. *Id*.

Justice Eakin found that the judicial opinions were "unfairly prejudicial if admitted before the jury finds the articles are in fact false," and rejected the majority's conclusion that a limiting instruction would be sufficient to cure this unfair prejudice and prevent the jury from considering the opinions when deciding the issue of falsity. *Id*. He continued that the "general notion of 'amelioration by instruction'" was unrealistic in light of the fact that the hearsay spoke directly to the issue of falsity, the declarants were judges, and the jurors would presume that they had knowledge of the facts. Justice Eakin stated, "I simply cannot agree the jurors will be able to disregard statements made by two judges opining on facts that are required for the

very basic determination the jurors are to make," and that "[n]o matter the length or repetition of precise and completely understandable legal instructions, no matter the jurors' desire to abide thereby, we cannot unring this bell." *Id*. at 1247.

Justice Eakin rejected the idea that the "jurors will compartmentalize this manifestly pertinent evidence, turning a deaf ear and a blind eye to judicial statements, simply by telling them not to consider it[.]" *Id*. He concluded that the cure to the problem would be simple: a "bifurcated trial on the questions of malice and falsity would eliminate the fiction that a jury could disregard the inadmissible evidence." *Id*.

Chief Justice Saylor agreed with the majority that the opinions by Judge Garb and Judge Feudale could be introduced on the question of whether the Scranton Times acted with malice. But, like Justice Eakin, Chief Justice Saylor disagreed with the *Castellani III* majority that a "cautionary instruction can effectively eliminate any undue prejudice stemming from exposure to these expressions" since they "speak directly and forcefully to that very issue" and "are made by judicial officers," to whom the jury would give great weight. *Id*. at 1246. He found the fact that judges made the statements would compound the prejudice to the Scranton Times. Chief Justice Saylor agreed with Justice Eakin that the opinions were therefore "inadmissible in a unified trial" and that "bifurcating the proceedings into falsity and malice stages would go a long way toward eliminating any unfair

prejudice that the Newspaper would otherwise suffer from introduction of the judicial opinions." *Id*. Chief Justice Saylor then observed that the bifurcation issue was not before the Supreme Court at that juncture, but had been raised in the present appeal. *Id*. at 1246 n. 1.

After our Supreme Court reversed *Castellani I*, it granted allowance of appeal of this panel's decision in *Castellani II* and issued the following directive:

> **AND NOW,** this 3rd day of March, 2016, the Petition for Allowance of Appeal is **GRANTED.** The Superior Court's decision is **VACATED,** and the matter is **REMANDED** to the Superior Court for further proceedings consistent with our decision in *Castellani v. Scranton Times*, *L.P.,* ––– Pa. ––––, 124 A.3d 1229, 1231 (2015).

*Castellani v. Scranton Times, L.P.*, 133 A.3d 5 (Pa. 2016).

This panel ordered new briefs and held oral argument on August 2, 2016, and we now reconsider our decision in *Castellani II* based upon our Supreme Court's holding on appeal in *Castellani I*. The Scranton Times confined its challenge to that aspect of the March 23, 2012 order denying its motion for bifurcation.

> Whether the Trial Court erred in refusing to bifurcate the issue of falsity of the January 12, 2004 Article from the remainder of issues in this jury trial to minimize the danger of unfair prejudice to the *Scranton Times* caused by the exposure of the jury to the September 18, 2004 Article and the July 7, 2005 Article, prior to the jury deciding if the January 12, 2004 Article was false.

Appellants' brief on remand at 5.

- 24 -

Initially, we note that, "The decision whether to bifurcate is entrusted to the sound discretion of the trial court, which is in the best position to evaluate the necessity for such measures." ***Gallagher v. Pennsylvania Liquor Control Bd.***, 883 A.2d 550, 557 (Pa. 2005). Thus, the appellate court must determine if the trial court's bifurcation decision "is a reasonable exercise of its discretion in this respect." ***Stevenson v. Gen. Motors Corp.***, 521 A.2d 413, 419 (Pa. 1987). We will not find an "abuse of discretion unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." ***Biese v. Biese***, 979 A.2d 892, 895 (Pa. Super. 2009)

Bifurcation is permissible under Pa.R.C.P. 213, which states: "The court, in furtherance of convenience or to avoid prejudice, may, . . . on motion of any party, order a separate trial of any cause of action, claim, or counterclaim, set-off, or cross-suit, **or of any separate issue** . . . ." Pa.R.C.P. 213(b) (emphasis added). Our Supreme Court has observed that "bifurcation should be carefully and cautiously applied and be utilized only in a case and at a juncture where informed judgment impels the court to conclude that application of the rule will manifestly promote convenience and/or actually avoid prejudice." ***Stevenson***, ***supra*** at 419 (citation omitted).

In order to review the decision to deny bifurcation, it is helpful to bear in mind the elements of a cause of action for defamation. A cause of action for defamation in this Commonwealth is set forth in § 8343 of The Uniform Single Publication Act, 42 Pa.C.S. §§ 8341-8345, as follows:

**(a) Burden of plaintiff.--**In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

   (1)   The defamatory character of the communication.

   (2)   Its publication by the defendant.

   (3)   Its application to the plaintiff.

   (4)   The understanding of the recipient of its defamatory meaning.

   (5)   The understanding by the recipient of it as intended to be applied to the plaintiff.

   (6)   Special harm resulting to the plaintiff from its publication.

   (7)   Abuse of a conditionally privileged occasion.

**(b) Burden of defendant.--**In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

   (1)   The truth of the defamatory communication.

   (2)   The privileged character of the occasion on which it was published.

   (3)   The character of the subject matter of defamatory comment as of public concern.

42 Pa.C.S. § 8343.

While the statute places the burden on a defendant to establish that a defamatory communication is true, there are First Amendment implications in a case where the defendant is a member of the media or the article involves a public figure or matter of public interest, such as the case herein. "If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Lewis v. Philadelphia Newspapers, Inc.,* 833 A.2d 185, 191 (Pa.Super. 2003). "If the plaintiff is a public official or public figure, [he] must prove also that the defendant, in publishing the offending statement, acted with actual malice, *i.e.* with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.*; *see Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) (under First Amendment, if media article relates to matter of public concern, private plaintiff has burden of proving defamatory statement is false); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (to protect First Amendment free speech rights, public officials must prove falsehood of media statement in defamatory case and must prove media defendant acted with actual malice). As can be seen from above, if the plaintiff is a public figure, the plaintiff must also prove, as part of his case, that the defendant acted with actual malice in publishing the statement.

The Commissioners initially maintain that the Scranton Times' renewed motion to bifurcate is legally infirm, and that **Castellani III** confirmed that position. We disagree. The bifurcation issue was not presented in the appeal before our Supreme Court. The issue before the **Castellani III** Court was only whether the opinions by Judges Garb and Feudale were inadmissible hearsay. **See Castellani v. Scranton Times, L.P.**, 124 A.3d 1229, 1246 n. 1 (Pa. 2015) (Chief Justice Saylor's concurring and dissenting opinion) ("The bifurcation issue was presented to the Superior Court in a separate interlocutory appeal.") Although the Supreme Court discussed the issue of bifurcation, any comments constituted *dicta* since that issue was not included within the allocatur grant. This matter was remanded back to the Superior Court specifically to address the denial of the bifurcation by the trial court.

Herein, the trial court concluded that the September 18, 2004 and July 7, 2005 articles, which contained the key aspects of the Garb and Feudale opinions, were admissible at the consolidated trial. Due to that ruling, the Scranton Times requested issue bifurcation so that the judicial opinions outlined in the September 18, 2004 and July 7, 2005 articles would not be utilized by the jury in its deliberations over whether the Commissioners established that the January 12, 2004 article was false. The order on appeal is the one where the trial court denied the bifurcation requests made by

Scranton Times.   We thus reject the Commissioners' position that the bifurcation issue is not properly before this panel.

The Commissioners next argue that the Supreme Court decision is law of the case and precludes us from ordering bifurcation.  They note that the Court pronounced that a curative instruction would ameliorate any prejudice inuring to the Scranton Times from introduction of the Garb and Feudale opinions.   However, the ***Castellani III*** Court did not, to any extent, examine the issue of bifurcation and whether bifurcation would be a **better** solution to the prejudice problem.   As Chief Justice Saylor noted, the bifurcation issue was not before the Supreme Court but was presented in this appeal.

In fact, the majority in ***Castellani III* expressly stated** that the bifurcation issue could be revisited despite its comments on the curative instruction.   The majority responded to dissents from Chief Justice Saylor and Justice Eakin by stating that "with respect to the responsive opinions' suggestion that the solution to the potential for any unfair prejudice is to bifurcate the falsity and malice elements, **we view this decision as appropriate for the trial court upon remand if requested by the Newspaper**." ***Castellani III***, 124 A.3d at 1245 n. 13.   Since the trial court's decision to deny bifurcation was still pending before this court, it was unnecessary to remand to the trial court.   Thus, the majority decidedly did **not** foreclose a finding that the issue of the falsity of the September 18,

2004 article could be bifurcated from the remaining issues. Instead, it specifically ruled that the trial court could decide that bifurcation was appropriate. Thus, we reject the Commissioners' argument that the Supreme Court's decision implicates the law of the case doctrine and precludes this panel from granting bifurcation.

In support of the denial of bifurcation, the Commissioners, in their fifty-nine page brief, next echo the trial court's reasons for denying bifurcation. The trial court herein justified its refusal to bifurcate on two grounds. As noted *supra*, its ruling in that respect was first premised upon its conclusion that bifurcation was a daunting task because the issues of the falsity of the January 12, 2004 article and whether it was published with actual malice were interwoven. The trial court also declined to bifurcate on the basis that bifurcation would deny the Commissioners their day in court as to the falsity of the September 18, 2004 article, which was the subject matter of their second defamation suit.

The Commissioners claim that the trial court was correct that the issues of falsity and actual malice are intertwined and interwoven and bifurcation of those questions is not possible. We reject this argument. Whether an article is false and whether a newspaper published it with actual malice are not issues that are interwoven. As outlined above, these two elements of a defamation cause of action are quite distinct. First, is the article true? If the article is false, did a newspaper publish the false

statement either knowing that it was false or without conducting enough investigation so that it acted with reckless disregard as to the falsity of the article? There is simply nothing intertwined in these two inquiries.

While the judicial opinions in question are inadmissible to establish falsity, they can be introduced as proof of the issue of malice. By bifurcating trial on the two questions, the Commissioners will not be prevented from introducing evidence relevant to both issues. On the other hand, bifurcation prevents the Scranton Times from suffering the clear prejudice inherent in allowing the jury to hear the opinions of Judges Garb and Feudale that the article in question was false and disproven by the record.

The Commissioners also maintain that the trial court did not abuse its discretion since they would be prejudiced by bifurcation. Specifically, they assert that the proposed bifurcation would strip the "Commissioners of their ability to prove critical aspects of their **consolidated** defamation actions, as the bifurcated proceedings would have removed from the jury's consideration the falsity of the September 18, 2004 article." Appellees' Brief on Remand at 46 (emphasis added). Bifurcation decidedly does not deny the Commissioners their day in court as to the September 18, 2004 article. If they prevail on the falsity of the January 12, 2004 article, they are assured of a finding of falsity on the second article that is the subject of this lawsuit.

Indeed, the September 18, 2004 article has been characterized as a republication of the January 12, 2004 article. If the latter is false, then it necessarily follows that the former is untrue. Thus, the bifurcation in question does not deny the Commissioners their day in court as to the September 18, 2004 article; it eases their burden. If the jury finds that the January 12, 2004 article is false, that determination becomes dispositive as to the falsity of the September 18, 2004 article. They will have their day in court.

Moreover, the fatal flaw in this position is that the Commissioners want to prove a critical aspect of their consolidated lawsuits, *i.e.*, the question of falsity, by having the jury consider evidence that has been unequivocally ruled to be irrelevant on that question. Indeed, the Commissioners' own argument establishes how important the opinions of Judges Garb and Feudale are to them on the question of whether the January 12, 2004 is untrue. However, those judicial opinions are inadmissible on the question of falsity. The Commissioners' argument in this respect does nothing more than reinforce the finding that the Scranton Times would be severely prejudiced if the jury had those opinions during its deliberation of whether the January 12, 2004 article is false. Simply put, the Commissioners cannot be prejudiced by being unable to use evidence that is **not** relevant as to falsity to, in fact, establish falsity.

Concomitantly, we discount the Commissioners' position that bifurcation must be denied because "the same evidence is relevant to both aspects of the issues upon which [the Scranton Times] seeks bifurcation." *Id*. at 49. The bottom line is that these two judicial opinions are inadmissible as to falsity and can be introduced **only** as to actual malice. Thus, the proof in question is unequivocally not relevant "to both aspects" of the issues upon which the Scranton Times seeks bifurcation.

We find our decision in ***Coleman v. Philadelphia Newspapers, Inc.***, 570 A.2d 552 (Pa.Super. 1990), is instructive on the bifurcation question. Coleman, who was president of Philadelphia City Council, sued for defamation as to an article that accused him of engaging in a practice of nepotism to fill city jobs. The trial court bifurcated the trial, asking the jury to first consider whether the article was true and the newspaper acted with actual malice. If those questions were answered in Coleman's favor, the trial court planned to submit to the jury the issues of whether the statements were capable of defamatory meaning and whether Coleman sustained damages.

The jury found that the newspaper did not act with actual malice; it did not render a decision on the veracity of the article, and the remaining two issues were not submitted to it for consideration. On appeal, Coleman complained that the court's bifurcation decision was in error, but we disagreed. Coleman argued that bifurcation of liability from the other issues

prejudiced him since he was not allowed to present relevant proof about the defamatory nature of the defendant's statements. He suggested that the defamatory character of a publication was an issue that could not be clearly categorized as either a liability or a damage issue, and that a publication's defamatory nature was inexorably interwoven with both the liability issue and the damage issue.

The *Coleman* Court noted that bifurcation is discouraged when evidence relevant to **both** the bifurcated issues would be excluded in one portion of the trial, resulting in prejudice to the party seeking to avoid bifurcation. It noted, however, that "bifurcation is **strongly encouraged** and represents a reasonable exercise of discretion where the separation of issues facilitates the orderly presentation of evidence and judicial economy, . . . or **avoids prejudice**[.]" *Id*. at 555 (emphases added).

This Court concluded that the bifurcation in question was appropriate since it allowed the jury to first focus on truth and malice, avoiding a trial on damages. We additionally observed that prejudice to the newspaper was avoided since Coleman may have been able to "to garner sympathy from the jury in establishing liability by use of damage evidence." *Id*. at 556. The *Coleman* Court also noted that, at the trial, Coleman had been permitted to introduce proof that was relevant both as to falsity/actual malice and as to defamatory nature of the statements in the article. *See also Ptak v. Masontown Men's Softball League,* 607 A.2d 297, 300 (Pa.Super. 1992)

(bifurcation of liability and damage upheld since it "insured that the jury's decision as to liability would not be tainted by sympathy for appellant, occasioned by the severity of his injuries").

In the final arguments in their brief, the Commissioners present hyperbolic, repetitive, and longwinded arguments that seek to justify the trial court's bifurcation decision on the grounds articulated by the trial court, which we have rejected. The issues of falsity and malice are not interwoven and intertwined, and the judicial opinions are not admissible as proof on the former, discrete question. The Commissioners also will not be deprived of their ability to proceed in the second defamation suit due to the bifurcation.

After careful review, we hold that the trial must be bifurcated as follows. The jury will first determine whether the Commissioners met their burden of proof that the contents of the January 12, 2004 article are false. If it finds in favor of the Commissioners as to that question, the September 18, 2004 article, as a republication is perforce rendered false. The jury will then proceed to determine, with the benefit of the opinions by Judges Garb and Feudale, whether the Scranton Times acted with actual malice when publishing the January 12, 2004 and September 18, 2004 articles. We conclude that it is absolutely necessary for the jury to decide first and separately the falsity of the January 12, 2004 article from the remaining issues to avoid significant prejudice to the Scranton Times, and we agree with the Scranton Times that the bifurcation ruling must be reversed.

We conclude that bifurcation is necessary for the following reasons. The two jurists, Judges Garb and Feudale, expounded forceful and unequivocal opinions that the statements in the January 12, 2004 article that form the basis for these defamations lawsuits were categorically false. The opinions emanated from judges, respected individuals in the community. Any juror would presume that the jurists knew about the matter, even though the opinions were founded upon a cold reading of the record and were not based upon an actual view of the grand jurors' reaction to the Commissioners' performances. Indeed, during its reversal of *Castellani I*, our Supreme Court openly acknowledged that two judicial opinions, as unequivocal condemnations of the article's falsity, "will undoubtedly be prejudicial to the Newspaper." *Castellani III*, *supra* 124 A.3d at 1245. In *Coleman* and *Ptak*, we upheld a determination that bifurcation was in order since the jury could be prejudiced and might find the defendants liable based upon the severity of the damages suffered by the plaintiffs. The prejudice inuring to the Scranton Times from these judicial opinions is obvious and more extreme than that examined in *Coleman* and *Ptak*. We therefore conclude the evidence in question is so prejudicial that bifurcation is necessary.

We thus reverse the March 23, 2012 order and remand this case with instructions. The issues in this consolidated lawsuit are to be bifurcated. The jury must first determine whether the January 12, 2004 article is false.

At that phase of the trial, the following evidence is inadmissible: the September 14, 2004 opinion by Judge Garb, the June 29, 2005 opinion by Judge Feudale, the September 18, 2004 article, and the July 7, 2005 article. If the jury determines that the January 12, 2004 article is false, the September 18, 2004 article's falsity will be established. The jury will then determine, with the use of the outlined evidence, whether the Scranton Times acted with malice.

Order reversed. Case remanded with instructions. Jurisdiction relinquished.

Judge Olson joins the opinion.

Judge Gantman concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/26/2017