J-A15026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SHIRLEY ARNOLD, AS ADMINISTRATRIX OF THE ESTATE OF EDWARD J. ARNOLD | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : : | |
| v. | : : | |
| WHITESTONE HEALTHCARE GROUP, LLC D/B/A WHITESTONE CARE CENTER, WHITESTONE HEALTHCARE GROUP, LLC, SABER HEALTHCARE GROUP, LLC, AND SABER HEALTHCARE HOLDINGS, LLC | : : : : : : : : : | |
| Appellants | : | No. 1592 EDA 2018 |

Appeal from the Judgment Entered May 4, 2018
In the Court of Common Pleas of Monroe County
Civil Division at No(s):  No. 2016-02396

BEFORE:   BENDER, P.J.E., GANTMAN, P.J.E., and COLINS*, J.

MEMORANDUM BY GANTMAN, P.J.E.:                    **Filed: August 22, 2019**

Appellants, Whitestone Healthcare Group, LLC d/b/a Whitestone Care Center, Whitestone Healthcare Group, LLC, Saber Healthcare Group, LLC, and Saber Healthcare Holdings, LLC, appeal from the judgment entered in the Monroe County Court of Common Pleas, in favor of Appellee, Shirley Arnold as Administratrix of the Estate of Edward J. Arnold.  We affirm.

In its opinions, the trial court correctly sets forth most of the relevant facts and procedural history of this case.  We add Appellants timely filed a notice of appeal on May 21, 2018.  The trial court ordered Appellants on May

_____

\* Retired Senior Judge assigned to the Superior Court.

25, 2018, to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b); Appellants timely complied on June 8, 2018.

Appellants now raise five issues for our review:

> WHETHER A NEW TRIAL SHOULD BE GRANTED BECAUSE IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE WAS INTRODUCED.
>
> WHETHER A NEW TRIAL SHOULD BE GRANTED BECAUSE RELEVANT AND ADMISSIBLE EVIDENCE WAS PRECLUDED.
>
> WHETHER A NEW TRIAL SHOULD BE GRANTED BECAUSE [APPELLEE'S] EXPERT WAS PERMITTED TO OFFER CAUSATION OPINIONS NOT PREVIOUSLY DISCLOSED AND BEYOND…THE FAIR SCOPE OF HIS REPORTS.
>
> WHETHER A NEW TRIAL SHOULD BE GRANTED BECAUSE OF THE EXTREME UNFAIR PREJUDICE SUFFERED BY [APPELLANTS] DUE TO THE TRIAL COURT'S REFUSAL TO BIFURCATE THE COMPENSATORY AND PUNITIVE DAMAGES PHASES OF TRIAL.
>
> WHETHER JUDGMENT N.O.V. OR A REMITTITUR, OR ELSE A NEW TRIAL ON DAMAGES, SHOULD BE GRANTED WITH RESPECT TO THE MANIFESTLY EXCESSIVE PUNITIVE DAMAGES AWARD.

(Appellants' Brief at 5).

The standard of review of a trial court's admission or exclusion of evidence is well established and very narrow:

> These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, [t]o constitute reversible error, an evidentiary

ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Jacobs v. Chatwani*, 922 A.2d 950, 960 (Pa.Super. 2007), *appeal denied*, 595 Pa. 708, 938 A.2d 1053 (2007).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable David J. Williamson, we conclude Appellants' issues merit no relief. The trial court opinions comprehensively discuss and properly dispose of the questions presented. (*See* Rule 1925(a) Trial Court Opinion, filed June 15, 2018, at 1-4) (finding: court clarifies that evidence of understaffing at time of Mr. Arnold's injury, failure to answer call bells, leaving Mr. Arnold unattended in wheelchair for lengthy period of time when he was tired from dialysis treatment and had fever, and change made to Mr. Arnold's medical chart several days after his fall that indicated he fell while attempting to self-transfer, when there was no direct evidence to verify that chart notation, supports jury's verdict; to extent Appellants claim evidence of these conditions did not cause Mr. Arnold's harm, the jury found this evidence credible and led to Mr. Arnold's harm; to extent Appellants complain their conduct was unintentional or did not rise to level of outrageous disregard, they ignore evidence of chronic understaffing and poor conditions, which caused inadequate supervision, response time, and care; these failures showed disregard for patient care and caused injury in nursing home, such as sliding out of wheelchair, when calls went unanswered; evidence was sufficient to warrant jury's award of punitive damages). (*See*

- 3 -

*also* Post-Trial Motion Trial Court Opinion, filed April 9, 2018, at 4-30) (finding: **(1)** evidence of conditions at Whitestone facility beyond events surrounding Mr. Arnold's fall were relevant both to issue of corporate negligence and punitive damages; specifically, testimony of current and former employees was relevant to demonstrate facility was continuously understaffed, complaints to management fell upon deaf ears, and mistakes were made and resident care suffered because of chronic understaffing; evidence was also relevant to show Appellants' reckless indifference to its residents; Department of Health surveys were admissible for purposes of punitive damages to show nursing home was aware of deficiencies but recklessly disregarded responsibility to correct them; bad acts evidence was not admitted to show bad character but to show Appellants were on notice of deficient conditions and failed to correct them; evidence showed Mr. Arnold fell from wheelchair on "hectic" day when only one nurse was present on Mr. Arnold's nursing floor; sufficient evidence supported jury's finding that if there had been more staff available, Mr. Arnold would not have suffered harm; there was sufficient evidence to demonstrate causal connection; **(2)** court precluded evidence of Mr. Arnold's fall several months later, at different nursing facility while attempting to self-transfer, because that event did not occur under sufficiently similar circumstances; evidence of Mr. Arnold's later fall was of limited relevance and would have had undue prejudicial effect; court precluded experts from testifying about Mr. Arnold's subsequent fall for same

reasons; **(3)** Appellee's expert Dr. Lipson did not testify outside fair scope of his report; report states Dr. Lipson reviewed relevant Minimum Data Sheets and found they were incomplete; Appellee's counsel asked Dr. Lipson if specific sections within records appeared accurate and moved on to other questions; **(4)** bifurcation of compensatory and punitive damages phases of trial was unnecessary because evidence Appellants challenged as relevant only to punitive damages was also relevant to Appellee's claim of corporate negligence; evidence of understaffing was relevant to both liability and damages portions of trial; **(5)** evidence supported finding of chronic understaffing, including time of Mr. Arnold's fall, failure to answer call bells, leaving Mr. Arnold unattended in wheelchair for lengthy period of time when he was fatigued and had fever, and altering Mr. Arnold's chart days after fall; these factors supported punitive damages award and amount awarded does not shock one's sense of justice).  The record supports the trial court's rationale.  Accordingly, we affirm on the basis of the trial court opinions.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/19

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

SHIRLEY K. ARNOLD, as Administratrix  : NO. 2396 CIVIL 2016
of the Estate of EDWARD J. ARNOLD,    :
Deceased,                             :
                                      :
              Plaintiff               :
                                      :
       vs.                            :
                                      :
WHITESTONE HEALTHCARE GROUP,          :
LLC d/b/a WHITESTONE CARE CENTER;     :
WHITESTONE HEALTHCARE GROUP,          :
LLC; SABER HEALTHCARE GROUP,          :
LLC and SABER HEALTHCARE             :
HOLDINGS, LLC,                        :
                                      : DEFENDANTS'
              Defendants              : MOTION FOR POST-TRIAL RELIEF


## OPINION

This matter comes before the Court on a Motion for Post-Trial Relief filed by the

collective defendants. Edward J. Arnold (hereinafter "Mr. Arnold") was a resident of Defendant

Whitestone Care Center ("Whitestone" or "facility") from April 2, 2014 until April 22, 2014. Mr.

Arnold entered the Whitestone facility for rehabilitation and recovery following a below the knee

amputation of his left leg and amputation of several toes on his right foot. During his time at the

defendant facility, Mr. Arnold underwent off-campus dialysis treatment three times a week. On

April 18, 2014, Mr. Arnold was brought back to Defendant Whitestone Care Center from his

third dialysis treatment of that week. Testimony during trial revealed that Mr. Arnold was fatigued and developing a fever at that time. Mr. Arnold was placed in a wheelchair in his room and left there alone for up to forty-five minutes. At approximately 5:00-5:15 p.m. Barbara Carrington, CNA, and Lynn Stettler, RN, made the decision to move Mr. Arnold from the wheelchair to his bed. Ms. Carrington left the room to retrieve a Hoyer Lift to facilitate the transfer while Ms. Stettler also left the room for unknown reasons. When they returned Mr. Arnold was on the floor. At the time, Mr. Arnold reported that he had fallen asleep and slipped out of the wheelchair. For the next few days Mr. Arnold continued his daily routines at the defendant facility including physical therapy. On April 21, 2014, an x-ray revealed Mr. Arnold had suffered a right hip fracture. Mr. Arnold was transferred the next day to Pocono Medical Center and never returned to Defendant Whitestone Care Center.

On October 17, 2015, Mr. Arnold passed away from causes unrelated to this litigation. On March 29, 2016, his wife, Shirley K. Arnold (hereinafter "Plaintiff"), filed a complaint in this matter as administratrix of his estate. The Defendants include not only the facility where Mr. Arnold's fall occurred, and a number of other entities Plaintiff claimed were negligent under the theories of corporate liability and joint venture. Plaintiff asserted that Defendants were negligent for Mr. Arnold's fall, and that the fall was the result of systematic understaffing of the facility caused by cost-cutting measures. Plaintiff sought both compensatory and punitive damages. On November 8, 2017, jury selection was held in this matter. After seven days of testimony, the jury returned a verdict in favor of the Plaintiff awarding her $250,000 in compensatory damages and $750,000 in punitive damages. Upon a polling of the jury, eleven of the twelve jurors concurred with the verdict. On December 26, 2017, the verdict of the jury was

2

molded to reflect the addition of delay damages in the amount of $6,116.43. By stipulation of the parties, the period to file supplemental grounds for post-trial relief was extended until January 26, 2018; briefs were due by February 26, 2018; and reply briefs were to be submitted to the Court by March 8, 2018. Defendants have filed a motion seeking various forms of post-trial relief including a new trial, a judgment notwithstanding the verdict, and remittitur.

## I. Legal Standards

**A. Motion for a New Trial**

Initially, Defendants seek a new trial on all issues. A trial court has broad discretion in granting or denying requests for a new trial. Flenke v. Huntington, 2015 PA Super 50, 111 A.3d 1197, 1199 (2015). "The grant of new trial is an effective instrument for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result." Harman ex rel. Harman v. Borah, 562 Pa. 455, 756 A.2d 1116, 1121(2000) *quoting* Dornon v. McCarthy, 412 Pa. 595, 195 A.2d 520, 522 (1963). A new trial is only appropriate when the jury's verdict "is so contrary to the evidence that it shocks one's sense of justice." Potochnick v. Perry, 2004 PA Super 393, 861 A.2d 277, 282 (2004). The first step in the court's decision whether to grant a new trial is to determine if there was a "factual, legal, or discretionary" mistake at trial. Flenke at 1199. Next, the court must decide if this error was of a severe enough nature to validate the granting of a new trial. Id. Not every irregularity warrants a new trial; "the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." Id. at 1200. In review, an appellant court will not disrupt a trial court's decision absent a clear abuse of discretion. Harman at 1122.

3

**B. Motion for Judgment Notwithstanding the Verdict**

Alternatively, Defendants seeks a judgment notwithstanding the verdict (judgment n.o.v.). A judgment n.o.v. allows a court to overturn the decision of a jury when either: "one, the movant is entitled to judgment as a matter of law... and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." Moure v. Raeuchle, 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (internal citations omitted). The verdict winner is allowed every reasonable benefit of fact and to have the evidence viewed in the light most favorable to their side. Nelson v. Airco Welders Supply, 2014 PA Super 286, 107 A.3d 146, 154 (2014). Judgment n.o.v. is only appropriate when it is clear that the verdict was incorrect and there is no doubt the moving party is entitled to relief. Moure at 1007.

## II. Discussion

In the interest of simplicity and thoroughness, we will address Defendants' arguments in the same order and with exact headings as it appears in their brief.

"I.   A New Trial Is Required Based On Plaintiff's Improper and Prejudicial Introduction of Evidence of Other Alleged Events, Deficiencies, Surveys, And Investigations, Including Events That Had Nothing To Do With Mr. Arnold's Care and Events That Occurred Both Before and After His Brief Residency At Whitestone."

"A. Plaintiff Interjected Irrelevant and Prejudicial Evidence As Part of a Trial Strategy to Cast the Jurors As Societal Crusaders Who Must Keep the Community Safe From Entities like Whitestone."

4

As an initial matter, we find that Defendants have waived their ability to appeal certain instances during the trial, including Plaintiff's use of the term "social crusaders" during counsel's opening and closing, for failure to object at the time of trial. "In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court." Fillmore v. Hill, 445 Pa. Super. 324, 328, 665 A.2d 514, 515 (1995). Although some of Defendants' arguments have clearly been waived, we will examine them to the best of the Court's ability.

The first section of Defendants' argument is a confusing collection of objections to almost every witness Plaintiff presented. The main theme of Defendants' lengthy claim seems to be the admission of evidence that was outside the scope of Mr. Arnold's care and the April 18th fall. This was a large part of the evidence Plaintiff presented at trial. Defendants characterize these "numerous criticisms" as completely unrelated to the facts of this case. Defendants cite Plaintiff's questioning of current and former employees Taylor Cammarata, Barbara Carrington, Robert Fahr, Lawrence Kuczma, Lynn Stettler, Rachel Verde, Michelle Katzenmoyer, and Kathleen Ritchie to have been wholly, or in part, irrelevant or prejudicial. Defendants also argue Plaintiff's expert Dr. Loren Lipson's testimony was improper. Defendants assert that any mention of conditions at the Facility that did not directly relate to Mr. Arnold's care was irrelevant and prejudicial. During trial, there was extensive testimony from a variety of witnesses on staffing deficiencies at Whitestone which led to related problems including difficulty in charting and responding to call bells. Included in the staffing issues were problems brought up during Department of Health surveys.

5

The arguments now advanced before the Court are substantially similar to ones which this Court has already examined, and denied, through pre-trial motions in limine. Defendants' oral motion for partial reconsideration on the issue of Department of Health surveys was also denied by the Court at time of trial. (N.T., November 9, 2017, p.7). We find that the evidence of conditions at the defendant facility outside of the events surrounding Mr. Arnold's fall were relevant both to the issue of corporate negligence and punitive damages. In the Superior Court's initial decision in Scampone v. Grane Healthcare (hereinafter "Scampone I"), the court found that nursing homes could be held liable for corporate negligence. Scampone v. Grane Healthcare Co., 2010 PA Super 124, ¶ 56, 11 A.3d 967, 976 (2010), aff'd in part on other grounds sub nom. Scampone v. Highland Park Care Ctr., LLC, 618 Pa. 363, 57 A.3d 582 (2012). In doing so, the court found that a nursing home could be found negligent "based upon its failure to formulate, adopt, and enforce adequate rules, and policies to ensure quality of care for patients." Id at 977. To succeed in such a cause of action, a plaintiff must show that the corporate entity had actual or constructive knowledge of the defects at their facility which created harm. Id. at 987. The evidence presented here was similar to the evidence presented by the Scampone plaintiff, namely testimony of current and former employees that the facility was continuously understaffed; that their complaints to management fell upon deaf ears; and that mistakes were made and resident care suffered because of understaffing. Therefore, the evidence about conditions at Defendant Whitestone Care Center outside of the care to Mr. Arnold was relevant to the issue of corporate negligence.

Further, the evidence Defendants now object to was relevant to the issue of punitive damages. "Punitive damages may be appropriately awarded only when the plaintiff has

6

established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or reckless indifference to the rights of others." Hall v. Episcopal Long Term Care, 2012 PA Super 205, 54 A.3d 381, 395 (2012) *quoting* Doe v. Wyoming Valley Health Care System, Inc., 987 A.2d 758, 768 (Pa.Super.2009), *appeal granted in part*, 607 Pa. 326, 6 A.3d 500 (2010). In Hall, the Superior Court held the trial court had erred in granting a directed verdict on the issue of punitive damages when the plaintiff had set forth evidence that the nursing home was chronically understaffed, leading to improper care of patients, that such complaints were unheeded by management, and staffing numbers were inflated during times of state inspections. Id. at 397. The court found this to be sufficient evidence the defendant had acted in reckless indifference of its residents. Further, the third in the Scampone line of cases ("Scampone III") held that Department of Health surveys are admissible for the purposes of punitive damages to show a nursing home was aware of deficiencies, but recklessly disregarded their responsibility to correct them. Scampone v. Grane Healthcare Co., 2017 PA Super 257, 169 A.3d 600, 626 (2017), *reargument denied* (Oct. 11, 2017). Specifically, the Superior Court held;

> "The surveys demonstrated the existence of across-the-board substandard care rendered at the nursing home and were relevant to show [Defendants] has knowledge of these deficiencies in patient care and blithely ignored them by failing to increase staffing levels... In other words, the deficiencies involved with [Decedent's] care were not isolated incidents, and the DOH surveys demonstrated that the nursing home was operated in a systemic manner such that patient neglect was common... The

7

failure to respond appropriately to these [survey] findings tended to establish that the defendants acted with reckless disregard as to the safety of their patients… The DOH surveys had a tendency to confirm that these types of abuses occurred."

Id. The surveys in this case revealed similar problems and issues. Therefore, we find no error in the admission of the testimony objected to by the Defendants.

"B.  The Evidence Interjected By Plaintiff Was Prejudicial "Bad Acts" Evidence."

Alternatively, Defendants argue the evidence was unduly prejudicial as "bad act" evidence that is inadmissible under Pa. R.E. 404(b)(1). The rule states that "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). Defendants assert that information regarding problems at the defendant facility was used to cast the entity as having a bad character. However, Defendant has failed to cite case law or explain how this rule of evidence applies to include a corporate entity's "bad character." The rule specifically states evidence is inadmissible to prove a **person's** character trait. Furthermore, the alleged actions were not intended to show how someone may have acted based upon prior actions; rather, it was to show advance notice and failure to correct. Therefore, we decline to extend the protections of Pa. R.E. 404(b)(1) to the corporate defendants in this matter.

"C. The Scampone Cases Do Not Justify The Introduction of Such Irrelevant And Prejudicial Evidence."

Next, Defendants argue that the Scampone line of cases and the rulings therein should not apply to the present matter. As we have already stated, the Hall and Scampone cases

8

do not support Defendants' request for a new trial or judgment n.o.v. Defendants believe the facts of those cases are distinguishable from the evidence heard at trial in this matter. The person in the middle of the Scampone trilogy was Madeline Scampone, a resident of the defendant nursing home facility from February 1998 until her death from a heart attack on February 9, 2004. Scampone I at 971. In December 2003 and, again, in January 2004, Ms. Scampone was hospitalized for urinary tract infections. Id. The second hospitalization included diagnoses of dehydration, malnutrition, and bed sores. Id. In reviewing trial testimony, the Superior Court noted that witnesses who had worked at the facility corroborated that the facility had been chronically understaffed and resident care had suffered because of it. Particularly unsettling was testimony that residents' water pitchers were left empty for days at a time and that Ms. Scampone had not received any fluids for days prior to her death and was crying for water. Id. at 989. The court reasoned that all of this evidence linked the lack of critical nursing Ms. Scampone had not received and her death, in addition to a finding of punitive damages. Id. at 992.

First, Defendants argue here that the evidence presented by Plaintiff at trial has failed to establish the same causal connection between understaffing and Mr. Arnold's injury. We find Defendants' arguments unpersuasive. Barbara Carrington testified the first floor of the defendant facility, where Mr. Arnold resided, was normally staffed with four certified nursing assistances ("CNAs"), two on Unit "A" and two on Unit "B." (N.T., November 9, 2017, p. 94). Ms. Carrington stated this was a sufficient number of staff to complete the required number of activities on the 3-11 p.m. shift. (N.T., November 9, 2017, p. 94). Lynn Stettler, the RN Supervisor on April, 15, 2014, agreed that four CNAs was appropriate, but believed the number could be reduced to three and still be sufficient depending on a number of factors. (N.T.,

9

November 14, 2017, p. 24-25). However, April 18, 2014 was, in Ms. Carrington's words, "hectic," because she was the <u>only</u> CNA on Unit "A" during the 3-11 p.m. shift. (N.T., November 9, 2017, p. 104-106). At some point prior to 5:15 p.m., Nurse Stettler and Ms. Carrington made the decision to move Mr. Arnold from his wheelchair into his bed due to what was described as a deteriorating physical condition; namely fatigue from his dialysis treatment that day, and a fever he had developed. Ms. Carrington left the room to retrieve a Hoyer lift which requires two people to operate, but only one to move. (N.T., November 9, 2017, p. 103). At this point, Nurse Stettler left Mr. Arnold in the room by himself, even though he was exhibiting symptoms warranting transference to his bed. Ms. Carrington testified "[Nurse Stettler] went down to the [front] desk- I don't know what she went to get- and by the time I got back he was on the floor." (N.T., November 9, 2017, p. 102). Ms. Carrington then found Nurse Stettler and together they used the Hoyer lift to place Mr. Arnold in his bed. We find that it is reasonable that the jury could have connected Mr. Arnold's fall, and therefore, harm, to the understaffing problems alleged at Defendant Whitestone. Whether the jury believed the Plaintiff or the Defendants' versions of Mr. Arnold's fall, both explanations occurred while he was left alone on a "hectic" day in which the floor he was on was missing a CNA. It is not difficult to make the connection that if there had been enough staff available so that someone could have stayed with Mr. Arnold while Ms. Carrington retrieved the Hoyer lift, or even could have recognized his need to be transferred to bed sooner, then the harm he suffered might have been avoided. Therefore, we find there was enough information for a jury to find a causal connection between the evidence presented and the harm Mr. Arnold suffered.

10

Defendants also object to certain evidence under the rationale of the Scampone cases based upon the limited nature of the harm alleged against Mr. Arnold and the short period in which he was a resident at the defendant facility. Defendants note that the decedent in Scampone had resided at the defendant nursing home for several years. Therefore, she was present during the time period covered by various Department of Health surveys and was feasibly subjected to the same treatment discussed in them. Defendants argue that much of Plaintiff's evidence, such as call bell responses, repositioning patients, or treating bed sores, had nothing to do with Mr. Arnold's care or injury. As we have already discussed, this evidence is relevant to the issue of punitive damages. Defendants counter this by claiming that Scampone and Hall both require that evidence of outrageous conduct must be directly connected to the care received by the plaintiff. However, a review of Scampone I shows that the passage referenced in the Hall case and Defendants' brief states "[d]eliberately altering patient records to show care was rendered that was not is outrageous and warrants submission of the question of punitive damages to the jury. **Other evidence** supporting an award of punitive damages **included** [Ms. Scampone's] lack of nursing care for a critical nineteen days prior to her death and her deplorable condition on January 30, 2004." Scampone I at 992 (emphasis added). We note that while the Superior Court considered evidence directly relating to Ms. Scampone's care in consideration of punitive damages, they also considered violations of the standard of care which did not directly concern her treatment.

Here, the Court permitted Plaintiff to admit into evidence Department of Health surveys prior to April 22, 2014 for the purpose of showing Defendants knew or should have known of staffing problems at the defendant facility. Mr. Arnold's stay at Whitestone did not

11

occur in a bubble. The problems which were ongoing when he arrived and during his stay could be found to have affected his care and put him at risk for additional harm. The Defendants' argument regarding the brevity of Mr. Arnold's stay at the facility would be counter to the rationale of the Hall and Scampone courts if we were to limit the evidence in cases where a resident is harmed while only briefly residing in a nursing home facility. To say otherwise would be to suggest that Mr. Arnold was owed a lesser duty of care or not entitled to the same legal protections as someone who had been a long-term resident of the same nursing home. Defendants' request will be denied.

"II.     A New Trial Is Required Based On The Improper And Prejudicial Preclusion of A Substantially Similar and Highly Relevant Event Barely Two Months After The Event At Issue In This Case, In Which Mr. Arnold Once Again Fell From His Wheelchair While Intentionally Attempting To Self-Transfer To Bed."

The next portion of Defendants' requested relief alleges the Court made a mistake in denying Defendants from presenting evidence of a subsequent fall Mr. Arnold suffered at a different nursing home facility several months after leaving Defendant Whitestone. Defendants argue this evidence was relevant because at the time of the second fall, Mr. Arnold admitted to self-transferring. Defendants believe the records from the other nursing home facility, Alaris, were relevant to the issues of negligence and comparative negligence at trial.

"A. The Alaris Records Were Clearly Relevant."

Defendants argue the Alaris records that show Mr. Arnold fell while self-transferring in July 2014 are relevant because it makes it far more likely he fell the same way in April 2014. Evidence is considered relevant if "it has any tendency to make a fact more or less

12

probable than it would be without the evidence." Pa. R.E. 401(a). However, simply because evidence is relevant does not mean that it is admissible. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Defendants argue that the two falls are similar enough under the Superior Courts decision in Blumer v. Ford Motor Co. that the relevance of the Alaris fall outweighs any prejudice. "[E]vidence is admissible only if the prior incident is sufficiently similar to the incident involving the plaintiff which occurred under sufficiently similar circumstances. **The burden** is on the party **introducing the evidence** to establish this similarity before the evidence is admitted." Blumer v. Ford Motor Co., 2011 PA Super 99, 20 A.3d 1222, 1228 (2011) *quoting* Lockley v. CSX Trans., Inc., 5 A.3d 383, 395 (Pa. Super. 2010) (citation omitted) (emphasis added). Additionally, "a wide degree of latitude is vested in the trial court in determining whether evidence is substantially similar and should be admitted." Id. at 1229.

Defendants' logic in connecting the two incidents as substantially similar is flawed. Defendants' only argument is that because Mr. Arnold fell twice in a nursing home setting within a few months, and that he admitted to self-transferring at Alaris, that this is somehow definitive proof Mr. Arnold was self-transferring in the incident at Whitestone. This ignores not only the incident reports in which Mr. Arnold stated that he fell asleep in his wheelchair at Whitestone, but also Nurse Stettler's testimony that Mr. Arnold stated "I slid, I slid," when found on the floor of his room at Whitestone Care Center. (N.T., November 14, 2017, p. 44). Defendants would have the Court believe that Mr. Arnold told the truth after one

13

fall, but lied about the cause of another. Also, as the Blumer court noted, whether prior incidents are similar depends upon the underlying theory advanced by the plaintiffs. Id. Here, Plaintiff argued Mr. Arnold's fall was caused when he was left alone in his wheelchair after undergoing his third dialysis of the week while exhibiting a fever. Plaintiff alleges understaffing led to him not being sufficiently monitored and promptly moved to his bed. Defendants have not provided evidence linking the two falls in terms of the following: Did the Alaris fall occur on the same day as Mr. Arnold's third weekly dialysis treatment? How long had he been sitting in his wheelchair? Did he have a fever? Was Mr. Arnold attempting to get into bed or onto a chair? Was he being otherwise monitored? Was Mr. Arnold's physical or emotional condition changed by the addition of a broken hip? Was there any evidence Mr. Arnold was trying to self-transfer at Whitestone? Defendants have boiled down the similar facts surrounding Mr. Arnold's two falls to their simplest terms; he fell down while in a nursing home. We fail to see how Defendants are able to connect a fall in which Mr. Arnold claimed he slid out of his wheelchair after falling asleep while unattended, with one in which he admitted to self-transferring some months later. Without this information we are left to conclude that the introduction of evidence of the Alaris records would have limited relevance and a great prejudicial effect.

"B. The Hearsay Rule Did Not Bar Admission Of The Alaris Records Because Medical Records Satisfy The Well-Settled Business Records Exception To The Hearsay Rule."

As we have already deemed the admission of the Alaris records as unduly prejudicial it is unnecessary to determine if such is admissible as an exception to the rule against hearsay.

14

"C. Even If The Hearsay Rule Is Barred Admission Of The Alaris Records As Substantive Evidence, Which It Did Not, Defense Counsel Should Have Been Permitted To Use the Records To Examine and Cross-Examine Expert Witnesses."

Defendants next allege that they were prejudiced by not being able to use the Alaris records in the examination of their expert witness, Dr. Ernest F. Gillan, and cross-examination of the Plaintiff's expert witness, Dr. Loren Lipson.

Defendants believe it was improper for the court to deny them the ability to directly examine their expert witness, Dr. Gillan, on the Alaris records under Pa. R.E. 703. The relevant rule of evidence states: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Pa.R.E. 703. Dr. Gillan was accepted by the Court as an expert in Family Medicine, Geriatric Medicine, and Nursing Home Care. (N.T., November 16, 2017, p. 32). Defendants argues that under Pa. R.E. 703, they should have been allowed to question Dr. Gillan about the Alaris medical records because he would have reviewed such in forming an opinion. It is important to note that this rule of evidence does not serve as a backdoor way to admit evidence which is otherwise inadmissible. As the Comment to Pa. R. E. 703 states, when the rule is used to present otherwise inadmissible evidence, "the trial judge upon request must, or on the judge's own initiative may, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion, and not as substantive evidence." Pa.R.E. 703 (Comment). As Defendants pointed out, Dr. Gillan's intention was to testify that the two

15

falls were "the exact same thing." In other words, use the expert testimony to present the same argument made when requesting admission of the Alaris records: to show a propensity for self-transfer and speculate the same thing happened at Whitestone. However, Defendants still would not have been able to present the Alaris records as substantive evidence. Based upon our previous discussion of the prejudicial nature of the Alaris records and the failure of Defendants to prove factual similarities between the two falls, we find that there was no error in not allowing Dr. Gillan to testify about the Alaris records.

Next, Defendants argue the Court erred in precluding them from cross-examining the Plaintiff's expert, Dr. Lipson, about the Alaris records. First, Defendants assert Plaintiff failed to filed a motion in limine to preclude the Alaris records. Motions in limine "can expedite the trial and assist in producing just determinations," but they are not requirements. Pa.R.E. 103 (Comment). Issues can also be decided and preserved for later appeal when made on the record at time of trial. Pa. R.E. 103(a)(1)(A). Therefore, there was no requirement that Plaintiff file a motion in limine to exclude the Alaris records prior to the trial commencing.

Next, Defendants argue they should have been able to cross-examine Dr. Lipson with the Alaris records once Dr. Lipson testified that there was no evidence in Mr. Arnold's medical records of self-transferring. Specifically he stated, "There was no evidence anyway from Mr. Arnold, Mr. Arnold's wife, or the other caregivers that there was any self-transferring." (N.T., November 13, 2017, p.62). Defendants have taken this statement out of context in believing this opened a door for admission of the Alaris records. At the time, Plaintiff's questioning was solely contained within the Whitestone medical records. Dr. Lipson's answer was given within the context that there was no further evidence, other than Ms. Carrington's

16

report, that Mr. Arnold had ever attempted to self-transfer at <u>Whitestone</u>. Upon cross-examination, Dr. Lipson admitted he had reviewed the Alaris records, but was not asked any questions about them due to the objection of Plaintiff's counsel. (N.T., November 13, 2017, p.228). The objection was sustained for the same reasons already discussed.

Finally, Defendants argue the preclusion of the Alaris records was unfair as Dr. Lipson interjected evidence of self-transferring. Defendant has failed to specify what this alleged interjection was or where it could be found in the record. Assuming it was the testimony noted above, the testimony was related solely to the records pertaining to Mr. Arnold's Whitestone stay and did not require admission of the Alaris records. Therefore, we find no error in precluding Defendants from cross-examining Dr. Lipson with the Alaris records.

"D. Even Putting Aside The Admissibility Of The Alaris Records Themselves, Mr. Arnold's Statements In the Records Were Admissible On Multiple Grounds."

Defendants' next argument is based upon three exceptions to the rule against hearsay which they believe make the Alaris records admissible. "Hearsay evidence is inadmissible unless it falls within a recognized exception to the exclusionary rule." <u>Lira v. Albert Einstein Med. Ctr.</u>, 384 Pa. Super. 503, 512, 559 A.2d 550, 554 (1989). "Even if it falls within an exception to the rule, however, hearsay evidence may not be received unless it is relevant and not excluded under another rule of evidence." <u>Id.</u> The first potential exclusionary rule is Pa. R.E. 803(25) which allows an opposing party's statements and Pa. R.E. 804 which allows a statement against interest. This would include Mr. Arnold's statement after the Alaris fall that he had been self-transferring. Next, Defendants assert the records are admissible under Pa. R.E. 803(4) as a statement made for medical diagnosis or treatment. Finally, Defendants allege that statements are

17

admissible under Pa R.E. 803's present sense impression exception. Defendants may be correct that the Alaris records fall under one of the enumerated hearsay exceptions; however, Defendants still have not overcome the hurdle of showing the records are relevant. As we have already stated, Defendants have failed to prove similarities between the two falls which would make the Alaris records more relevant than prejudicial.

"E. Mr. Arnold's July Fall Was Substantially Similar To His April Fall, So It Was Clearly Admissible, And the Bases (sic) On Which Plaintiff Opposes And The Court Precluded The July Fall Were Clearly Erroneous."

Defendants reassert an argument they set forth at trial that evidence of the subsequent fall at Alaris was relevant under Pa. R.E. 404(b)(2) to show motive, intent, plan, knowledge, or lack of accident. Pa. R.E. 404 states, in part:

"(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404.

18

This issue was first brought to the Court's attention during cross-examination of Dr. Lipson on November 13, 2017. The Court allowed the parties to submit briefs during trial on the matter. The Court eventually ruled in favor of the Plaintiff. Defendants now challenge this ruling by arguing the Court improperly differentiated between prior and subsequent acts. Contrary to Defendants' argument the Court did not put any reasoning for this decision on the record, either distinguishing between prior and subsequent falls or otherwise. The Court simply stated "[the witnesses are] not going to testify about his subsequent fall at that later date." (N.T., November 15, 2017, p. 167). There is no indication in the record that the fact that the Alaris fall occurred after the Whitestone fall was the sole basis for the Court's preclusion of evidence surrounding it. The real issue appears to be Defendants' assertion that Mr. Arnold's July fall occurred under virtually identical circumstances as his April fall, and therefore, the evidence was relevant and admissible under Pa. R.E. 404(b).

Defendants' logic for admission of this evidence under Rule 404(b) appears to be that the subsequent fall in July at Alaris is relevant to proof of a lack of an accident in April while at Whitestone. In other words, because Mr. Arnold fell in July at Alaris from self-transferring, that incident is relevant to proving lack of accident in the April fall at Whitestone when Mr. Arnold may have been doing the same thing. This presumes a couple of factors not shown in this case. First, that the incidents were similar. As discussed earlier, the incidents were not shown to be similar. In the Whitestone incident, Mr Arnold was left unattended for a long period of time, he had just completed his third dialysis treatment of the week, and was suffering from a fever. Whitestone medical records and Nurse Stettler's testimony confirmed Mr. Arnold's explanation that he fell asleep and then slid out of the wheelchair to the floor. This was different

than his admitted self-transfer attempt at Alaris. While factually different, the issue was compounded by Mr. Arnold having died and unable to testify about each incident. Other than falling at a facility, the incidents are not so similar as to come under 404(b).

Second, the Alaris information must be otherwise admissible without being used merely to show character and conformity therewith at time of the disputed incident. However, that is exactly what the Defendants want to do in this case. They seek to introduce a particular behavior of Mr. Arnold, being his attempt to self-transfer while at Alaris, to prove character conformity or propensity that he did the same thing earlier in April while at Whitestone. That is the type of evidence 404(b)(1) prohibits. Furthermore, such evidence, if introduced, would be impossible to rebut as Mr. Arnold died and could not testify about either incident. As such, Defendants failed to set forth an exception under Pa. R.E. 404(b)(2).

> "F. Preclusion of the July Fall Was Especially Prejudicial Because Defense Counsel Had Referenced The Fall In His Opening Statement, Without Objection, And The Subsequent Preclusion of That Fall Allowed Plaintiff And His Expert to Ridicule Defense Claims That The April Fall Occurred While Mr. Arnold Was Self-Transferring."

Defendants argue Plaintiff waived any objection to evidence of the Alaris fall by failing to promptly object to the mention of it in Defendants' opening statement. Plaintiff did not lodge an objection until several days later when Defendants attempted to cross-examine Dr. Lipson with the Alaris records. As previously stated, "[f]ailure to timely object to a basic and fundamental error will result in waiver of that issue." Hong v. Pelagatti, 2000 PA Super 373, ¶ 24, 765 A.2d 1117, 1123 (2000). We find the two cases Defendants cite are easily

20

distinguishable. In Samuel-Bassett v. Kia Motors Am., Inc, the defendant did not object to the jury verdict sheet as violating a previous court order until post-trial motions were filed. Samuel-Bassett v. Kia Motors Am., Inc., 613 Pa. 371, 447, 34 A.3d 1, 46 (2011). The court held that defendants should have objected contemporaneously with the jury questionnaire or, at least, with the later molding of the verdict. Id. In the Connolly v. Brink case, the court found that a plaintiff had waived her right to object to the contents of the opposing parties' opening statement when she waited to lodge an objection until the close of evidence while making a motion for a new trial. Connolly v. Brink (No. 2), 32 Pa. D. & C.4th 210, 214 (Com. Pl. 1996), aff'd sub nom. Connolly v. Brink, 701 A.2d 785 (Pa. Super. Ct. 1997). The court held that waiting until evidence had concluded and using the objectionable to statement in support of a motion for a new trial was inappropriate. Id. We do not find Plaintiff was untimely in objecting to the Alaris records. Although no objection was made during Defendants' opening statement, one was made at the first opportunity in which the Alaris records were offered as evidence. As Plaintiff correctly notes, opening statements are not evidence, and the jury was cautioned not to consider them as such. Therefore, we find that the Plaintiff's objection to the records was timely.

Next, Defendants argue preclusion of the Alaris records was used to "ridicule" the defense claims that the April fall occurred while Mr. Arnold was self-transferring. In particular, Defendants cite Plaintiff's examination of Ms. Carrington and Nurse Stettler in which counsel inquired whether there was anywhere else in the record showing Mr. Arnold had attempted to self-transfer. Defendants appear to have taken this as a personal attack as they claim the record shows Mr. Arnold did try to self-transfer. However, in the context of the questioning of the witnesses, it is clear that Plaintiff's counsel was asking solely about the Whitestone records and

21

not all of the patients' records, including while at Alaris. A key component of the defense was that Ms. Carrington wrote in the records a few days after the incident that Mr. Arnold had tried to self-transfer. It is not a matter of "ridicule" to allow the opposing party to question the only two staff members present at the time of the incident as to what they observed, nor would it be to ask why Ms. Carrington added the self-transferring detail to a later report when it was not contained within her original one. This was drawing attention to a discrepancy in the medical records. It was the decision of the jury whether or not to believe the witnesses' explanations. Finally, regarding Defendants' argument that "the record" showed evidence of self-transferring, we find that it would not have been appropriate or admissible to ask these witnesses about the Alaris incident. Neither Ms. Carrington, nor Nurse Stettler cared for Mr. Arnold at Alaris, and the fall occurred after his stay at Whitestone. There was no evidence that they would have had any knowledge the later fall had even occurred other than by review of the Alaris records. Therefore, we find no error.

"III.    A New Trial Is Required Because, Having Successfully Precluded Evidence of the July Fall On The Basis That It Occurred After The April Fall, Plaintiff Then Gratuitously And Prejudicially Interjected Evidence Of A Post-Accident Department Of Health Survey During Both His Cross-Examination Of A Defense Witness And In His Closing Argument."

Defendants next argue a new trial is appropriate because Plaintiff's counsel violated the Court's November 6, 2017 Order. That Order granted in part, and denied in part, Defendants' motion in limine to preclude evidence of Department of Health investigations and surveys at Defendant Whitestone. The Court allowed evidence of surveys that were issued during

22

and prior to Mr. Arnold's stay, while all surveys issued after April 22, 2014 that followed his stay were prohibited. Defendants assert Plaintiff brought up a prohibited survey from April 30, 2014, while cross-examining the defense's expert, Nancy Kuss, RN. The question at issue involved a specific line from Nurse Kuss's report in which she referenced the April 30, 2014 survey. (N.T., November 16, 2017, p. 153). Nurse Kuss immediately responded that it was her understanding that no surveys from after Mr. Arnold's stay were to be discussed. (N.T., November 16, 2017, p.153). At that point defense counsel objected to the line of questioning and requested a mistrial. The Court then sustained Defendants' objection to the line of questioning, but denied Defendants' request for mistrial as the objected to testimony was harmless error. No facts or information about the April 30, 2014 survey were revealed to the jury. In the context given, there was no harm to any party. As the Court stated at sidebar, "[t]here is nothing that's come in that the jury has heard that they even understand at this point about the issue." (N.T., November 16, 2017, p. 155).

Second, Defendants contend Plaintiff's objections in closing arguments, during which Defendants' counsel claimed that the Department of Health surveys did not relate to Mr. Arnold or to falls generally, was an inappropriate way to introduce the April 30th survey. Specifically, Plaintiff's counsel stated, "I hate to do it, but he's bringing in that 4/30 survey right now insinuating that there was no deficiencies related to him because there was no survey- not once deficiency about Mr. Arnold." (N.T., November 17, 2017, p.145-146). The objection was denied and defense counsel was allowed to continue his closing argument. (N.T., November 17, 2017, p. 148).

23

Defendants now argue that the objections were violations of the Court's Order and require the Court to grant a new trial. We reiterate that a new trial is only appropriate when "the original trial, because of taint, unfairness or error, produces something other than a just and fair result." Harman supra. at 1121. Although it is clear that Plaintiff attempted to bring in evidence of the April 30th survey, including his objection during Defendants' closing argument, we find it was harmless. Numerous witnesses, including the Defendants' own experts, testified that Department of Health surveys are a frequent occurrence in every nursing home across the state. The knowledge that surveys were conducted at Defendant Whitestone in addition to those the jury heard about is in and of itself not grounds for a new trial. Likely, that is something the jury could have inferred themselves based upon testimony about the nature of Department of Health surveys and their role in monitoring and improving nursing home facilities. As to Defendants' argument that the objections somehow inferred that the April 30, 2014 survey was detrimental to the defense, we do not find that to be persuasive. No substantive evidence was provided to the jury other than there was an additional Department of Health survey at Defendant Whitestone that was not allowed as evidence because it occurred after Mr. Arnold left the facility. That information alone does not support one side of the case or another. If anything, Plaintiff interrupting Defendants' closing argument would make the evidence appear more favorable to the Defendants' case to a lay juror. Therefore, we find that while Plaintiff attempted to introduce evidence in violation of this Court's Order, it was harmless error and not prejudicial to the Defendants. The motion for a new trial on this basis will be denied.

    "IV.    A New Trial Is Required Because Plaintiff's Long-Term Care Expert, Dr. Lipson, Was Improperly Permitted To Offer Opinions On Causation, And To Support Those

24

Opinions By Relying On Minimum Data Set (MDS) Sheets, Where Neither The Causation Opinions Nor Dr. Lipson's Reliance on The MDS Sheets Were Disclosed In His Pretrial Reports."

Defendants next request a new trial based upon Plaintiff's expert's, Dr. Lipson discussing Minimum Data Sheets ("MDSs") despite allegedly not discussing them in his expert report. Defendants assert the only reference to MDSs in Dr. Lipson's report was a note stating that they were incomplete in the records. Plaintiff's counsel did offer testimony from Dr. Lipson regarding MDS records at trial. "The admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." Woodard v. Chatterjee, 2003 PA Super 207, ¶ 16, 827 A.2d 433, 440 (2003) *quoting* Walsh v. Kubiak, 443 Pa.Super. 284, 661 A.2d 416, 419 (1995) *(en banc)*.

The purpose of an expert report is to prevent unfair surprises at the time of trial and to allow the opposing party to acquire their own expert to testify. Id at 441. An expert is limited to testifying within the "fair scope" of their expert report, and he "may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or included in a separate report." Id. There is no bright line rule to define what "fair scope" is, rather the court must decide, based upon the contents of the expert's report and his testimony at trial, that the opposing party would be able to prepare a meaningful response and not be misled. Id. We do not find that Dr. Lipson testified outside the fair scope of his report. The report states that he reviewed the relevant MDS records and found them to be incomplete. Dr. Lipson's report also alleged that documentation following Mr. Arnold's fall had been incomplete and inadequate, including the later allegation and entry by

Ms. Carrington that he had self-transferred. (N. T., November 13, 2017, p. 87). During trial, Plaintiff's counsel briefly asked Dr. Lipson if the MDS records showed behavioral signs or symptoms which would include rejection of care and if that appeared accurate. (N.T., November 13, 2017, p.90-92). Then Plaintiff's counsel moved on to questioning Dr. Lipson about the incident reports in this matter. We do not find that under the circumstances Dr. Lipson testified outside the scope of his report. Dr. Lipson had reviewed the MDS records and stated that they appeared incomplete. Plaintiff's counsel asked him if specific sections within the records appeared accurate and moved on to other questions. Therefore, the motion for a new trial on these grounds will be denied.

"V.     A New Trial Is Required Because The Compensatory And Punitive Phases Of Trial Should Have Been Bifurcated."

The Defendants next request a new trial based upon the Court's error in not bifurcating the compensatory and punitive phases of the trial. Prior to testimony beginning on the first day of trial, defense counsel made a motion for bifurcation which was denied by the Court. (N.T., November 9, 2017, p.5-6).

> "The court, in furtherance of convenience or to avoid prejudice, may, on its own motion or on motion of any party, order a separate trial of any cause of action, claim, or counterclaim, set-off, or cross-claim, or of any separate issue, or of any number of causes of action, claims, counterclaims, set-offs, cross-suits, or issues."
> Pa. R.C.P. No. 213(b).

"Bifurcation should be carefully and cautiously applied and be utilized only in a case and at a junction where informed judgment impels the court to conclude that the application

26

of the rule will manifestly promote convenience and/or actually avoid prejudice." Castellani v. Scranton Times, L.P., 2017 PA Super 127, 161 A.3d 285, 297, appeal denied, 174 A.3d 553 (Pa. 2017) *quoting* Stevenson v. Gen. Motors Corp., 513 Pa. 411, 521 A.2d 413, 419 (1987). The decision to bifurcate is entrusted to the sound discretion of the trial court. Id. *quoting* Gallagher v. Pennsylvania Liquor Control Bd., 584 Pa. 362, 883 A.2d 550, 557 (2005). A trial court's decision is appropriate as long as the decision was not "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will." Id *quoting* Biese v. Biese, 979 A.2d 892, 895 (Pa. Super. 2009).

We believe the denial of bifurcation was appropriate in this matter. Defendants argue that Plaintiff was able to present a number of "wrongdoings" unrelated to Mr. Arnold's care to the jury under the rationale of the Scampone cases which, while relevant to the issue of punitive damages, were needlessly prejudicial to the liability portion of the case. However, this argument ignores the relevance of the evidence to the issue of corporate negligence as we have explained in ruling on Defendants' previous arguments. The evidence Defendants allude to would have been admissible under the Scampone line of cases for the purpose of proving both corporate negligence and punitive damages. Had the Court bifurcated the matter into separate trials, many of the same witnesses would have been called to testify to the same things during both parts of the trial, leading to great inconvenience and a waste of judicial resources. Furthermore, the evidence was not needlessly prejudicial as staffing concerns were blamed for the fall and the evidence was in some way tied to the staffing. Therefore, as the evidence was relevant to both portions of the trial, we do not find that Defendants were prejudiced by the Court's denial of their motion to bifurcate. This request for a new trial will be denied.

27

"VI.    Judgment N.O.V. Or A Substantial Remittitur Are Required With Regard To The

Jury's Manifestly Excessive Award Of Punitive Damages."

Finally, Defendants seek either judgment n.o.v. or a substantial remittitur of what they describe as the jury's excessive punitive damages award. Defendants argue that if the Court is unwilling to entertain their motion for a new trial or judgment notwithstanding the verdict, they are entitled to remittitur. Remittitur is essentially a judicial reduction of a monetary award. "Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." Potochnick at 285 *quoting* Haines v. Raven Arms, 536 Pa. 452, 455, 640 A.2d 367, 369 (1994). Although the decision to grant or deny remittitur is solely within the discretion of the trial court, such relief should only be granted when a jury award "so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." Id.

First, Defendants assert that there was no evidence presented at trial upon which a jury could have found Defendants acted in intentional or outrageous disregard of a known harm to Mr. Arnold. We have previously discussed that under the relatively recent decisions in Hall and Scampone, evidence such as chronic understaffing, failure to answer call bells, or failure to keep adequate medical records can be a basis for finding punitive damages in a nursing home context. We also reviewed prior to trial the Defendants' argument that there was no evidence that the Defendants acted in reckless disregard of Mr. Arnold and found it unpersuasive. Conditions at a nursing home generally are relevant because all patients can be placed in danger by failures of a facility to preform to the applicable standard of care required. The evidence at time of trial supported a finding of understaffing, including at the time of Mr Arnold's injury, the failure to answer call bells, leaving Mr. Arnold unattended in his wheelchair for a lengthy period of time

28

when he was tired from dialysis and had a fever, and a change to Mr. Arnold's chart several days after the fall indicating he was self-transferring when there was no direct evidence to report such a finding. With the facts given to the jury, they could have found grounds to award punitive damages.

We also do not find the amount of the jury award to be so great as to shock one's sense of justice. The punitive damages granted by the jury here was three times the amount of the compensatory damages. In Pennsylvania, "the size of a punitive damages award must be reasonable related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." Hollock v. Erie Ins. Exch., 2004 PA Super 13, 842 A.2d 409, 419 (2004) *quoting* Shiner v. Moriarty, 706 A.2d 1228, 1241 (Pa. Super. 1998). However, there is no set formula for determining punitive damages based upon an award of compensatory damages. Our Superior Court has stated that rather than a formula, "the ratio of punitive damages to the harm caused by the Defendant is a tool to ensure that the two bear a reasonable relationship to each other. Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1." Grossi v. Travelers Pers. Ins. Co., 2013 PA Super 284, 79 A.3d 1141, 1160 (2013) (internal citations omitted). The jury awarded $250,000 in compensatory damages and $750,000 in punitive damages. We do not consider a punitive damage award of three times the compensatory damages as here, against a nursing home under the circumstances of this case, provided the jury believed the facts favorable to the Plaintiff to be unreasonable. Testimony showed consistent understaffing, lack of full staff on the date of the

29

incident, and records changed several days after the accident to note a self-transfer by Mr. Arnold when there was no other mention of it previously, or facts to support it. Nursing homes care for the most vulnerable members of the community, and the jury's verdict in this matter was not outrageous or a shock to one's sense of justice. Therefore, the Defendants' request will be denied.

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

SHIRLEY K. ARNOLD, as Administratrix : NO. 2396 CIVIL 2016
of the Estate of EDWARD J. ARNOLD, :
Deceased, :
           :
      **Plaintiff** :
           :
     **vs.** :
           :
WHITESTONE HEALTHCARE GROUP, :
LLC d/b/a WHITESTONE CARE CENTER; :
WHITESTONE HEALTHCARE GROUP, :
LLC; SABER HEALTHCARE GROUP, :
LLC and SABER HEALTHCARE :
HOLDINGS, LLC, :
           : **DEFENDANTS'**
      **Defendants** : **MOTION FOR POST-TRIAL RELIEF**

# O R D E R

**AND NOW,** this 9th day of April, 2018, Defendants' Motion for Post-Trial Relief is DENIED.

BY THE COURT:

_____
DAVID J. WILLIAMSON, J.

cc:    Ian T. Norris, Esq.
       Paul F. Laughlin, Esq.

DJW2018-024 Arnold v. Whitestone 2396 CV 2016.docx

31

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | |
|---|---|
| SHIRLEY K. ARNOLD, as Administratrix<br>of the Estate of EDWARD J. ARNOLD,<br>Deceased, | : NO. 2396 CIVIL 2016<br>:<br>:<br>: |
| **Plaintiff** | :<br>: |
| vs. | :<br>: |
| WHITESTONE HEALTHCARE GROUP,<br>LLC d/b/a WHITESTONE CARE CENTER;<br>WHITESTONE HEALTHCARE GROUP,<br>LLC; SABER HEALTHCARE GROUP,<br>LLC and SABER HEALTHCARE<br>HOLDINGS, LLC, | :<br>::<br>:<br>:<br>:<br>: |
| **Defendants** | :<br>: PA.R.A.P. 1925(a) |

## OPINION PURSUANT TO PA. R.A.P. 1925(a)

Appellants, Whitestone Healthcare Group, LLC, d/b/a Whitestone Care Center,

Whitestone Healthcare Group, LLC, Saber Healthcare Group, LLC, and Sabar Healthcare

Holdings, LLC, have filed a Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P.

1925. We have reviewed Appellants' Statement and find that issues complained of in paragraphs

1-5 therein were addressed fully by the Opinion with accompanying Order dated April 9, 2018.

The issues raised in paragraph 6 by the Appellants were also addressed in that Opinion and

Order. However, we add the following for purposes of clarification.

Appellants stated that this Court "refused to disturb the punitive damages award on the basis that "[c]onditions at a nursing home generally can support such an award. . ." The language cited is actually part of a sentence taken out of context and is not the sole basis to support an award for punitive damages. The cited language (appearing at page 28 of the Opinion and Order) was part of a discussion on relevant evidence that can support an award for punitive damages. The cited sentence actually reads in full as: "[c]onditions at a nursing home generally are relevant because all patients can be placed in danger by failure of a facility to perform to the applicable standard of care required." (Opinion and Order 4/9/18 at p. 28).

The sentence was in the context of a discussion about relevance of chronic understaffing, failure to answer call bells, and failure to keep adequate medical records as issues that can be a basis for finding punitive damages against a nursing home. The evidence at trial supported a finding by the jury of understaffing, including at time of Mr. Arnold's (Appellee's) injury; failure to answer call bells; leaving Mr. Arnold unattended in a wheelchair for a lengthy period of time when he was tired from dialysis treatment and he had a fever; and, a change made to Mr. Arnold's medical chart several days after his fall that indicated he fell while attempting to self-transfer, when there was no direct evidence to report such a finding by the staff. Appellee contended these conditions led to Mr. Arnold falling out of the wheelchair and suffering an injury. These were the facts at issue we cited as grounds that a jury could find for an award of punitive damages.

To the extent Appellants are raising an issue that such evidence of conditions did not lead to the harm suffered by Mr. Arnold, they have ignored the above-cited evidence that the jury found credible. To the extent Appellants are raising an issue that such conduct was not an

2

intentional or outrageous disregard of a known harm to Mr. Arnold, we again cite the facts set forth at time of trial. There was evidence set forth of chronic understaffing. This was noted by several different witnesses, including employees at the nursing home at the time Mr. Arnold was a patient. This can create a lack of adequate supervision and care. The lack of supervision and care by leaving Mr. Arnold alone in his wheelchair under the circumstances allegedly caused his injury. There was also evidence adduced of failure to answer call bells. This is a condition that can cause inadequate supervision, response time and care. Such failure shows a disregard for patient care and can cause injury in a nursing home, such as sliding out of a wheelchair and falling to the ground when calls go unanswered. There was no direct evidence that Mr. Arnold pressed the call bell and it went unanswered when he fell out of the wheelchair, but a jury may have found it was possible. There was evidence that Mr. Arnold was left alone in his wheelchair after returning from dialysis, showing signs of fatigue and having a fever. Testimony at trial was that he could have been alone waiting for staff to transfer him to his bed, for up to 30 minutes. This was more than enough time for Mr. Arnold to fall asleep and slide out of his wheelchair, which could have been prevented with an immediate transfer to the bed, additional staff to monitor patients, and responding efficiently to patient needs. A jury could have found that these facts were evidence of more than just simple negligence. These facts supported an intentional disregard of a known risk of harm to Mr. Arnold.

Finally, the jury could also find for punitive damages based upon the conduct of Appellants after the injury to Mr. Arnold. Evidence suggested that his chart was changed several days after his fall indicating he fell while attempting to self-transfer from the wheelchair to the bed. However, there was no direct evidence to support such a notation in the chart, nor an

3

adequate explanation of why the change was made several days after the fall instead of contemporaneously at the time of injury. The jury certainly could have found that this was outrageous conduct by Appellants in an attempt to shift liability for the incident. Whether it was or not was up to the jury, but there was sufficient evidence to consider such for punitive damages.

**BY THE COURT:**

Dated: 6/15/18

_____
**DAVID J. WILLIAMSON, J.**

cc:    Ian T. Norris, Esquire
       Paul F. Laughlin, Esquire

DJW2018-056 Arnold v Whitestone PaRAP1925(a) 2396 CV 2016.docx

Monroe Prothonotary
JUN 15 '18 PM3:54

4